

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RESEARCH IN MOTION LIMITED and RESEARCH IN MOTION CORPORATION, | § § § | Civil Action No. 3:06-cv-973-N |
| Plaintiffs, | § § | ECF |
| v. | § § | Judge Godbey |
| DATAQUILL BVI, LTD., | § § | |
| Defendant. | § § § | Jury Trial Demanded |

## Second Amended Complaint for Declaratory Judgment of Patent Non-Infringement, Invalidity, and Unenforceability

Plaintiffs Research in Motion Limited ("RIM Ltd.") and Research in Motion Corporation ("RIM Corp."), (collectively, "RIM"), for their Second Amended Complaint against Defendant DataQuill BVI, Ltd. ("DataQuill"), hereby demand a jury trial and allege as follows:

### NATURE OF THE ACTION

1.  This is an action arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, for a declaratory judgment that RIM does not infringe DataQuill's patents, that DataQuill's patents are invalid, and that DataQuill's patents are unenforceable.

### PARTIES

2.  Plaintiff RIM Ltd. is a corporation organized and existing under the laws of the province of Ontario, Canada, having its principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada N2L 3W8.

3.  Plaintiff RIM Corp. is a corporation organized under the laws of the state of Delaware, having a principal place of business at 122 W. John Carpenter Parkway, Suite 430, Irving, Texas 75039.  RIM Corp. is the U.S. distributor of RIM Ltd. products and services.

4.  Upon information and belief, Defendant DataQuill is a limited company organized and existing under the laws of the British Virgin Islands, having its principal place of business in Tortola, British Virgin Islands.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a) and 2201 because this action seeks a declaratory judgment regarding rights arising under the patent laws of the United States.

6.  This Court has personal jurisdiction over DataQuill because DataQuill has established minimum contacts with the forum and the exercise of jurisdiction over DataQuill would not offend traditional notions of fair play and substantial justice.

7.  Venue is proper in this District under 28 U.S.C. §§ 1391(d) because DataQuill is an alien that may be sued in any district.

## FACTUAL BACKGROUND FOR DECLARATORY JUDGMENT COUNTS

8.  DataQuill is the assignee of record of United States Patent No. 6,058,304 entitled "Data Entry System" ("the '304 patent") (attached hereto as Exhibit 1) and United States Patent No. 7,139,591 entitled "Hand Held Telecommunications and Data Entry Device" ("the '591 patent") (attached hereto as Exhibit 2) (collectively, the "patents in suit").

9.  A valid and justiciable controversy regarding the patents in suit has arisen between RIM and DataQuill that is properly presented for judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

10. RIM has not infringed and is not infringing any valid and enforceable claim of the patents in suit.  In addition, the claims of the patents in suit are invalid and each patent in suit is unenforceable.

## COUNT I

### (Request for Declaratory Judgment of Non-Infringement and Patent Invalidity of U.S. Patent No. 6,058,304)

11. RIM re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 10.

12. RIM has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '304 patent, either literally or under the doctrine of equivalents.

13. Based on statements made by the applicant during prosecution of the '304 patent, DataQuill is estopped from asserting that RIM infringes the '304 patent.

14. The '304 patent is invalid for failing to satisfy one or more of the conditions of patentability under 35 U.S.C. §§ 102, 103, and/or 112.

## COUNT II

### (Request for Declaratory Judgment of Non-Infringement and Patent Invalidity of U.S. Patent No. 7,139,591)

15. RIM realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 14.

16. RIM has not infringed, contributed to the infringement of, or induced infringement of any valid and enforceable claim of the '591 patent, either literally or under the doctrine of equivalents.

17. Based on statements made by the applicant during prosecution of the '591 patent, DataQuill is estopped from asserting that RIM infringes the '591 patent.

18. The '591 patent is invalid for failing to satisfy one or more of the conditions of patentability under 35 U.S.C. §§ 102, 103, and/or 112.

## COUNT III

**(Request for Declaratory Judgment of Unenforceability of the Patents in Suit)**

19. RIM realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 18.

### (a)  Failure to Disclose the Two-Page Brochure Publicly Distributed at ScanTech

20. United Kingdom patent application no. 9321133 was filed October 13, 1993, in the name of Garry Robb alone (the "Robb GB application").  On September 27, 1994, a PCT application -- PCT/GB94/02101("the PCT application") -- was filed.  The PCT application attempted to claim priority to the Robb GB application, and was filed as a continuation in part of the Robb GB application, as it added two new inventors (Francis John Callaghan and Paul Marshall Doran), three new figures (10, 11, and 12), text describing the same, and added references to "cellular" throughout the specification, *inter alia*.  The PCT application designated the U.S., was nationalized in the U.S., and became the '304 patent once issued.  Upon information and belief, the asserted claims are not supported by the Robb GB

application pursuant to 35 U.S.C. § 112, and the priority claim in the PCT application to the Robb GB application is improper under 35 U.S.C. § 119.

21. Before filing the PCT application leading to the '304 patent, named inventor Garry Robb formed a company called Winfair Systems, upon information and belief.  Upon information and belief, personnel involved with Winfair Systems prepared a two-page brochure to market a prototype device, referred to as a "DataQuill" "pen" because of its pen-like shape.  Upon information and belief, the two-page brochure was distributed in a double-sided copy on A4 paper.  Named inventor Garry Robb and others including Jan Orkicz publicly distributed approximately 250-300 brochures at a trade show, called "ScanTech," held at the National Exhibition Centre in Birmingham, England, on or about June of 1992, on information and belief.  The ScanTech trade show was an exhibition directed to those interested in bar code scanning technology and was described in the Glasgow Herald at the time as being regarded by those in the business as the most important scanning technology exhibition in the world.

22. Upon information and belief, Mr. Robb was aware of the prior publication of the two-page brochure because he was instrumental in the public distribution of that brochure at ScanTech.  The public distribution of that brochure on in June of 1992 was more than one year before the filing of the PCT application on September 27, 1994, and more than one year before the filing of the Robb GB patent application on October 13, 1993.  Thus, the prior publication of the two-page brochure is prior art under 35 U.S.C. § 102(b) regardless of whether the priority claim to the Robb GB application was proper.  Further, the two-page brochure was material to patentability of the claims of the application leading to the '304 patent; for instance, the two-page brochure anticipates at least claims 29 and/or 31 of the

'304 patent.  But, Mr. Robb failed to disclose the two-page brochure to the USPTO during the prosecution of the '304 patent.  It would have been important to a reasonable examiner to know of the prior publication of the two-page brochure when examining the claims of the application leading to the '304 patent.  The high degree of materiality creates an inference that the failure to disclose was intentional, rendering the '304 patent unenforceable.

### (b) Failure to Disclose the Glasgow Herald Publication

23. On August 25, 1992, in Glasgow, Scotland, the Glasgow Herald published an article entitled "Winfair Launches Two-Way Bar Code Reader," showing a pen-shaped device reading a bar code ("the Glasgow Herald article").  The article paraphrased Mr. Robb's comments to a Glasgow Herald reporter with respect to his involvement with Winfair Systems and the DataQuill pen-shaped device.  The Glasgow Herald article was published more than one year prior to the September 27, 1994 filing of the PCT application, and more than a year prior to the October 13, 1993 filing of the Robb GB application; and thus, constituted prior art under 35 U.S.C. §102 regardless of whether the priority claim under 35 U.S.C. § 119 to the Robb GB application was proper.

24. It would have been important to a reasonable examiner to be informed that the named inventor Robb had publicly disclosed the subject matter of the claimed invention via the Glasgow Herald article describing the DataQuill pen-shaped device more than one year before filing the Robb GB application and/or the PCT application.  Upon information and belief, at least Mr. Robb was aware of the Glasgow Herald article, having been interviewed for the article, and intentionally failed to disclose the article to the USPTO during prosecution of the '304 patent.  Further, combining the Glasgow Herald Publication with the two-page brochure discussing the same device and the same ScanTech tradeshow would have

rendered at least claims 29 and/or 31 obvious under 35 U.S.C. §103.  The high degree of materiality of the Glasgow Herald article creates an inference that Mr. Robb possessed intent to withhold this information from the USPTO.  Mr. Robb's intentional failure to disclose this material information to the USPTO constituted inequitable conduct and renders the '304 patent unenforceable.

### (c) Mischaracterization of Two-Page Brochure Publicly Distributed at ScanTech

25. The '591 patent issued from patent application 10/869,215, which was a continuation of application 09/548,565, while was a continuation of the application leading to the '304 patent.  The '591 application similarly includes a claim to priority to the Robb GB application; however, since the asserted claims of the '591 application are not supported by the Robb GB application under 35 U.S.C. § 112, the priority claim under 35 U.S.C. § 119 to the Robb GB application is improper.

26. On March 30, 2005, Mr. Jan Orkicz was deposed in the case of *DataQuill v. Kyocera*, then pending in the U.S. District Court for the Southern District of California.  At his deposition, Mr. Orkicz testified that he and Mr. Robb publicly distributed at the ScanTech exhibition, described above, the *two-page* brochure (Orkicz deposition exhibit 93) depicting a DataQuill pen-shaped device and containing marketing information.

27. Unlike the prosecution of the '304 patent in which the two-page brochure was never cited to the USPTO by DataQuill, DataQuill did submit the two-page brochure during the prosecution of the '591 patent.  On September 19, 2005, just months after Mr. Orkicz's testimony, DataQuill's counsel, Joseph Hetz of the Brinks Hofer law firm, filed an Information Disclosure Statement ("IDS") submitting the two-page brochure to the USPTO, *inter alia.*  However, upon information and belief, DataQuill's counsel mischaracterized the

nature of the document that Mr. Orkicz had testified that he and Mr. Robb had publicly distributed at ScanTech.  In the IDS, DataQuill's patent prosecution counsel Hetz represented to the USPTO that the document that had been publicly distributed at ScanTech in June of 1992 was a *one-page* flyer, not the *two-page* brochure that was publicly distributed according to Mr. Orkicz's testimony.  DataQuill's patent prosecution counsel Hetz submitted the *one-page* flyer to the USPTO, identified it as  "Document C88" and characterized it by stating: "Document C88 includes a copy of Winfair Systems (Scotland) Limited flyers believed based on present investigation and recollection of events to have been made available to attendees at a trade show exhibition in the United Kingdom in June 1992.  Mr. Garry Robb was a principle [sic] of Winfair Systems."  September 19, 2005 IDS.

28. With respect to the *two-page* brochure, however, that Mr. Orkicz testified to having distributed with Mr. Robb at ScanTech, DataQuill's counsel Mr. Hetz only stated in the IDS:  "In addition, Document C111 is a copy of two-sided Winfair System flyers, which flyers are *believed* to have been *made* in 1992."  *Id.* (emphasis added).

29. By mischaracterizing the two-page brochure as "believed to have been made" by Winfair Systems (Scotland), *instead of having actually been made and distributed* publicly more than a year before the filing of the application leading to the '304 patent, and doing so months after receiving Orkicz's testimony directly to the contrary, DataQuill's counsel committed an omission of material information during prosecution of the application for the '591 patent.  Upon information and belief, that material omission implied to the USPTO that the two-page brochure was not prior art.

30. Upon information and belief, at least DataQuill's patent prosecution counsel Hetz and Mr. Robb were aware of the two-page brochure and of Mr. Robb's and Mr. Orkicz's

public distribution of the two-page brochure, either based on personal knowledge or via Mr. Orkicz's testimony.

31. It would have been important to a reasonable examiner to know that the detailed two-page brochure was publicly disseminated to the relevant public more than a year prior to the filing of the Robb GB application, to which both the '304 and '591 patents attempted to claim priority, and more than one year prior to the filing of the PCT application that became the '304 patent, to which the '591 patent claimed priority. Further, the two-page brochure anticipates at least claim 1 of the '591 patent. Thus, the publicly disclosed *two-page* brochure was prior art under 35 U.S.C. § 102(b) regardless of whether the priority claim to the Robb GB application was proper, and material to the patentability of the claims of the '591 patent. With this high degree of materiality, intent can be inferred, and the '591 patent is unenforceable.

### (d) Failure to Disclose the One-Page Flyer Publicly Distributed at ScanTech

32. During prosecution of the '591 patent, after Mr. Hetz submitted IDS on September 19, 2005 containing the mischaracterization of the two-page brochure, as discussed in paragraphs 25-31 above, Mr. Robb was re-deposed in the *DataQuill v. Kyocera* case on October 26, 2005. In that deposition, Mr. Robb testified that he publicly distributed at least twenty copies of the one-page flyer to interested attendees at ScanTech in June of 1992. However, Mr. Robb failed to disclose the one-page flyer to the USPTO during the prosecution of the application leading to the '304 patent. Examples of the materiality of the one-page flyer include that: the one-page flyer, in combination with the Glasgow Herald article discussed above, renders obvious at least claim 29 and/or 31 of the '304 patent; and,

the one-page flyer alone anticipates at least claim 31 of the '304 patent.  With this high degree of materiality, intent can be inferred, and '304 patent is unenforceable.

### (e)  Failure to Disclose Actions in European Counterpart Applications

33. The '591 patent is unenforceable because, during prosecution of the application for the '591 patent, DataQuill committed inequitable conduct by failing to disclose to the USPTO materials relating to proceedings concerning European counterpart applications to the '304 and '591 patents in suit.

34. DataQuill filed two European counterpart applications to the patents in suit, both of which also included a priority claim to the Robb GB application:  EP Application 94927728.9 (the "EP parent application," revoked by the European Patent Office ("EPO") on February 21, 2005) and EP98200196.8 ("the EP divisional application").  Third parties filed "Oppositions" against the issuance of the claims in each EP application. (An EPO Opposition is a proceeding in which third parties can oppose the issuance of a patent, somewhat akin to a reexamination request in the U.S. filed after the patent issues.)  The EPO considered and responded to those Oppositions.

35. Three third parties lodged separate Oppositions to the EP divisional application – Philips (May 19, 2004), Nokia (June 24, 2004), and Alcatel (June 23, 2004).  Each Opposition relied upon various prior art references and also challenged the EP divisional application's priority date claim to the October 13, 1993 filing date of the Robb GB application (discussed above). Each Opposition argued that the priority date of the EP divisional application should be limited to September 27, 1994 and that the priority date claim to October 13, 1993 was improper.  The EPO subsequently sustained this priority

challenge. Nevertheless, throughout the prosecution of the U.S. patent application leading to the '591 patent, DataQuill maintained that it was entitled to claim priority to the Robb GB application. In contravention of MPEP 2001.06 and MPEP 2001.06(a), throughout prosecution of the application leading to the '591 patent (issued November 21, 2006), DataQuill, the listed inventors and their patent prosecution counsel, upon information and belief, failed to inform the USPTO of the challenges to the priority date in the Oppositions and the bases therefore.

36. Upon information and belief, at least named inventors Doran and Callaghan and DataQuill's patent prosecution counsel Mark Milhench were aware of the Oppositions and the priority date challenges. For example, each opposition was prosecuted on behalf of DataQuill, and primarily by Mr. Milhench. In the prosecution of the EP parent application, while responding to the Oppositions, DataQuill's foreign associate requested an extension of time to reply to Oppositions because of Mr. Milhench's transfer from a former firm to Mintz Levin Cohn Ferris Glovsky and Popeo Intellectual Property, LLP ("Mintz Levin"), and to consult with named inventors Frank Callaghan and Paul Doran. Specifically, in a letter to the EPO dated 8 September 2004, Mintz Levin stated: "The respondent's principal contact, Mr. Frank Callaghan, was advised at the beginning of August by Mr. Milhench that he would be leaving Jenkins. … Mr. Callaghan subsequently concurred with his business partner, Mr. Paul Doran, on Mr. Doran's return from holiday and with his legal advisors in the USA who are currently litigating the corresponding US patent, and decided to transfer responsibility for the respondent's patent portfolio from Jenkins to ourselves [Mintz Levin] because Mr. Milhench has been involved with the DataQuill patent portfolio since 1997. … A further point to note is that as the respondent is currently litigating his corresponding US patent any

reply prepared by ourselves should be reviewed by the respondent's US advisors prior to filing, and in the time available this is clearly impossible." Upon information and belief, Mr. Callaghan and Mr. Doran were similarly consulted in the prosecution of the EP divisional application.

37. Upon information and belief, at least Mr. Doran, Mr. Callaghan, and Mr. Milhench and associates at Mintz Levin knew of the proceedings in the counterpart EP applications and knew that information concerning those proceedings was material to the prosecution of the pending application leading to the '591 patent.

38. Further, upon information and belief, DataQuill's U.S. patent attorney knew of the existence of the Oppositions filed in the EP counterpart application and was also aware of the duty to disclose material information from foreign counterpart applications.

39. For example, in an Information Disclosure Statement ("IDS") filed on October 1, 2004 in the prosecution of the U.S. patent application leading to the '591 patent, attorney Joseph Hetz of the Brinks Hoffer Gilson and Lione law firm submitted, to the USPTO, an Office Action (and an English translation thereof) issued by the Japanese Patent Office in a Japanese counterpart application to the '304 patent. Mr. Hetz also submitted, to the USPTO, copies of prior art references cited in a Japanese Office Action and stated "Applicants also note that [prior art reference] documents A134-A138 were cited in an Official Action in a Japanese patent application corresponding to parent U.S. Patent No. 6,058,304. A copy of an English translation of that Official Action is enclosed as document A251." Oct. 1, 2004 IDS at 2. By doing so, DataQuill's counsel demonstrated that it understood the materiality of foreign counterpart patent applications, office actions and prior art cited therein and demonstrated that it understood its duty to disclose that material information to the USPTO.

40. However, when submitting information relating to the European counterpart applications to the USPTO, DataQuill's counsel Hetz submitted only the docket sheets from those EP applications and not material underlying documents from those EP applications, such as documents reflecting the challenges to the priority date in the EP Oppositions mentioned above. In connection with filing a September 19, 2005 IDS in the application leading to the '591 patent, DataQuill's counsel Hetz submitted the docket sheets and stated: "Regarding documents C1-C235, multiple of these documents were either identified by Kyocera or DataQuill, and/or … identified as additional information in EPO proceedings concerning counterpart patent applications. … Documents C181 and C182 are online docket sheets of the EPO proceedings." Sept. 19, 2005 IDS at 2. However, attorney Hetz remained completely silent that any Opposition proceedings had taken place and that the priority claim was being questioned.

41. It would have been important to a reasonable USPTO examiner examining the application leading to the '591 patent that the priority date of the EP counterpart application was being challenged, because that priority date challenge would impact the priority date for the U.S. application leading to the '591 patent, which also purports to claim priority therefrom. A U.S. patent application's claim for priority is highly material to the patentability of what the application claims to be the invention because a priority date defines the temporal scope of the prior art and, accordingly, may determine validity, whether an issue arises in prosecution or later in court challenges to validity. The challenge to the priority date in the EP divisional application refutes or, at the least, is inconsistent with the position that DataQuill takes in asserting that the U.S. application leading to the '591 patent was

proper.  It would have been important to a reasonable examiner to consider the arguments concerning the priority date in the EP Oppositions.

42. Thus, Mr. Callaghan, Mr. Doran, and Mr. Hetz withheld from the USPTO material information concerning the Oppositions in the European divisional application, including information concerning the priority date challenges.  Based on this showing of materiality, intent can be inferred, and the '591 patent is unenforceable.

### (f) Failure to Disclose Garry Robb's '790 Patent Application and Art Cited Therein

43. On July 16, 1998, Garry Robb filed U.S. Patent Application S/N 09/101,790 ("the Robb '790 application") in his own name.  The Robb '790 application included disclosure and claims that were closely related to the disclosures of the '304 and '591 patents in suit. More specifically, the specification of each of the Robb '790 application and '304 and '591 patents discloses a device having a display, a reading sensor, and a telecommunications interface, for example.  As an example of claim similarity, during the prosecution of the Robb '790 application, Mr. Robb added claim 30 in a preliminary amendment filed on July 16, 1998.  Claim 30 was directed to "[a] personal communication device, comprising: a display for displaying data and video signals; a loudspeaker for generating an audible signal; a microphone for receiving an audio signal; a keypad for entering data, a telecommunications interface for receiving and transmitting information; and an integral adjustable reading head for producing an image signal."  Claims of the '304 patent, including claims that DataQuill alleges RIM's products to infringe, include substantially similar limitations.  For example, claim 1 of the '304 patent calls for "[a] data entry device" comprising "a display", the data entry device being integral with a cellular telephone (microphone and loudspeaker), a "reading sensor," "communications interface," and a "reading sensor," *inter alia.*  Dependent

claim 7 of the '304 patent includes one or two manually operable switches, for which DataQuill has accused RIM's keys on the keyboard as meeting this limitation.  Accordingly, since at least as of July 16, 1998, the claims of the Robb '790 application could have conceivably served as the basis of a double patenting rejection in the prosecution of the patents in suit; therefore, the existence of the Robb '790 application was highly material to patentability of the '304 patent.

44. Further, during the prosecution of the Robb '790 application, in an Office Action dated October 27, 1999, examiner Ramakrishnaiah rejected claim 30 and others as obvious over GB2289555A in view of U.S. Patent No. 5,436,654 (dated Feb. 7, 1994), *inter alia*.   On April 26, 2000, applicants to the Robb '790 application limited claim 30 by narrowing the scope in an attempt to avoid the prior art references.  The fact that examiner Ramakrishnaiah rejected claim 30 and others on the basis of prior art was material to the prosecution of the '304 patent for at least two reasons.

45. First, as demonstrated by claim 30, for example, at least some claims of the Robb '790 application were substantially similar to claims of the '304 patent.  By prosecuting the claims of the '304 patent, DataQuill was necessarily asserting to the USPTO that those claims were patentable.  However, the USPTO's rejection of a substantially similar claim, such as claim 30 of the '790 Robb application, refutes and is inconsistent with this position.  Such a contrary decision by another USPTO examiner reviewing a substantially similar claim was highly material to the prosecution of the '304 patent.

46. Second, the prior art rejection of claim 30 and others would have been important to the Examiner of the application leading to the '304 patent, because Mr. Robb's response of narrowing the scope of the claims in place of asserting any claim to priority such as to the

Robb GB application at least call into question the viability of the priority claim for the patents in suit.

47. Other prior art considered by the USPTO during prosecution of the Robb '790 application also was material to the examination of the pending claims of the claims of the applications leading to the patents in suit. For example, one prior art reference cited during the prosecution of the Robb '790 application was U.S. Patent No. 5,491,507 to Umezawa ("Umezawa"). Umezawa disclosed a portable handheld computer that could include an integrated camera. Upon information and belief, this reference would have been important to a reasonable examiner examining the application leading to the '304 patent for at least the reason that the '304 patent contains claims directed to a hand holdable unit that includes an integrated camera, such as claims 13, 45, and 46. Further, the USPTO has already determined that "a reasonable examiner would consider the above prior references [including the Umezawa patent] important, alone or in combination as stated in the Request, in making a decision as to the patentability of claims 1-62 of the '591 patent" in an Order dated May 4, 2007, in application control number 90/008,394 (reexamination of the '591 patent), at pp. 2-3. The claims of the '591 patent are patentably indistinct from those of the '304 patent.

48. At least Mr. Robb withheld the existence of the Robb '790 application from the USPTO examiner who evaluated the applications leading to the patents in suit. The existence of the Robb '790 application, examiner Ramakrishnaiah's rejections of the claims, and prior art cited during prosecution of the '790 application each would have been important to a reasonable examiner examining the applications leading to the '304 patent.

49. At least Mr. Robb (and possibly others involved in prosecuting the application leading to the '304 patent) failed to satisfy his duty of disclosure to the USPTO by

intentionally withholding the material information described above.  USPTO rules provide that "[i]ndividuals … cannot assume that the examiner of a particular application is necessarily aware of other applications which are 'material to patentability' of the application in question, but must instead bring such other applications to the attention of the examiner." Manual of Patent Examination Procedure ("MPEP") 2001.06(b).  The showing of materiality of the withheld information creates an inference that the failure to disclose the Robb '790 Robb application and the prior art cited therein was intentional.  This intentional failure to disclose highly material information to the USPTO during prosecution of the application leading to the '304 patent constituted inequitable conduct, rendering the '304 patent unenforceable.

### (g) Failure to Disclose Proper Inventorship

50. Upon information and belief, personnel at the University of Edinburgh, Jimmy Johnstone and Rainer Thonnes, contributed to the conception of the subject matter of the alleged invention of each of the patents in suit by their collaboration with Mr. Robb on a device for barcode scanning.  For example, software and/or firmware that would have been necessary to practice even a single embodiment of the alleged inventions of the '304 and '591 patents.  It was at least Mr. Thonnes who worked for almost five years in an effort to create such software and/or firmware for DataQuill's pen-shaped prototype device.  Upon information and belief, Mr. Thonnes contributed to the conception of the subject matter related to the software/firmware in the pen in an effort to cause the controller to be responsive to a command to cause downloading of information from a remote processing center for updating information previously stored in the data entry device, as is claimed in '304 patent 1 and 2 (and claims dependent therefrom) and '591 patent claims 61 and 62.

Upon information and belief, Mr. Johnstone contributed to the conception of the subject matter related to the "telecommunications interface" claimed in at least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of the '591 patent.  On information and belief, others in the United Kingdom, including Alec Tait, Jan Orkicz, and Anthony Hopkin, also may have contributed to the conception of the subject matter of at least one claim of each of the patents in suit, including the software for the telecommunications interface of at least claims 1 and 2 of the '304 patent (and claims dependent therefrom) and claim 1 of the '591 patent.

51. The proper identity of inventors is material to patentability, since a patent cannot issue if the named inventors did not invent the subject matter sought to be patented under 35 U.S.C. § 102(f).  It would have been important to a reasonable examiner to be informed that the inventive entity named on the application leading to each of the '304 and '591 patents in suit was incorrect.  The high degree of materiality of the identification of proper inventorship creates an inference that the misrepresentation of inventorship to the USPTO was intentional.  Moreover, at least named inventor Robb was aware of the inventive contributions of Messrs. Johnstone, Thonnes, Tait, Orkicz and/or Hopkin because of his collaboration with those individuals, and Mr. Robb intentionally withheld disclosure of the contributions of any and all of those omitted inventors to the USPTO during prosecution of the applications for both the '304 and '591 patents.  Therefore Mr. Robb committed inequitable conduct, and, as a result, each of the patents in suit is therefore unenforceable.

### (h) Infectious Unenforceability

52. Under the doctrine of infectious unenforceability, the existence of inequitable conduct during prosecution of a patent can lead to the unenforceability of a related patent if

the inequitable conduct has an immediate and necessary relation to the equity that DataQuill seeks in respect of the matter in litigation.  The application leading to the '591 patent is a continuation of U.S. patent application 09/548,565, which is a continuation of the application leading to the '304 patent.  The disclosure and claims of the '591 patent are substantially the same as that of the '304 patent.  Thus, inequitable conduct occurring during the prosecution history of the '304 patent necessarily relates to the claims of the '591 patent.  As such, while RIM has set forth independent bases for the unenforceability of the '591 patent, to the extent that the '304 patent is unenforceable due to inequitable conduct, the '591 patent is also unenforceable based on the doctrine of infectious unenforceability.  Therefore, each basis for inequitable conduct set forth above with respect to the '304 patent further relates to and taints all issued claims of the '591 patent and thus further renders the '591 patent unenforceable.

## JURY DEMAND

53. Under Rule 38(b) of the Federal Rules of Civil Procedure, RIM respectfully requests a jury trial on all issues and claims.

## PRAYER FOR RELIEF

WHEREFORE, RIM prays for judgment against DataQuill, and that the Court award the following relief:

A.      Declare that RIM has not infringed, has not contributed to infringement of, and has not induced infringement of any claims of the patents in suit, either literally or under the doctrine of equivalents;

B.  Declare that the claims of the patents in suit are invalid;

C.  Declare that the patents in suit are unenforceable;

D.  Enter an order preliminarily and permanently enjoining DataQuill, its officers, directors, servants, managers, employees, agents, successors and assignees, and all persons in active concert or participation with any of them, from directly or indirectly charging RIM with infringement of any claim of the patents in suit;

E.  Declare this case exceptional under 35 U.S.C. § 285 and award RIM its reasonable attorneys' fees, expenses and costs incurred in this action; and

F.  Award RIM such other and further relief as this Court deems just and proper.

Dated:  June 11, 2008                    Respectfully submitted,

/s/ Peter J. Chassman

Peter J. Chassman (*pro hac vice*)
Attorney-in-Charge
chassmanp@howrey.com
Texas State Bar No. 00787233

Gregory A. Duffey
duffeyg@howrey.com
Texas State Bar No. 50511771

Robert A. Calico III (*pro hac vice*)
calicor@howrey.com
Texas State Bar No. 24059527

HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77002
Tel: 713-787-1400
Fax: 713-787-1440

ATTORNEYS FOR RESEARCH IN MOTION LIMITED AND RESEARCH IN MOTION CORPORATION

Second Amended Complaint for Declaratory Judgment of
Patent Non-Infringement, Invalidity, and Unenforceability
DM_US:21139180_3

Page 20

## CERTIFICATE OF SERVICE

I certify that on the 11th day of June, 2008, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system sent a "Notice of Electronic Filing" to the following individuals who have consented in writing to accept this Notice as service of this document by electronic means:

> Kay Lynn Brumbaugh
> Jerry L. Beane
> ANDREWS KURTH LLP
> 1717 Main Street, Suite 3700
> Dallas, Texas 75201
>
> David Berten
> Gregory J. Smith
> Rhett Dennerline
> COMPETITION LAW GROUP
> 55 W. Monroe Street, Suite 1930
> Chicago, Illinois 60603

I hereby certify that I have served the foregoing document by mailing a copy to the following individuals:

> None

/s/ Peter J. Chassman
Peter J. Chassman