IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RESEARCH IN MOTION LIMITED, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:06-CV-0973-N |
| DATAQUILL BVI, LTD., | § § | |
| Defendant. | § § | |

## ORDER

This Order addresses the construction of numerous disputed claim terms of U.S.

Patent No. 6,058,304 (the "'304 Patent") and U.S. Patent No. 7,139,591 (the "'591 Patent")

(collectively, the "Patents"), pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S.

370 (1996). Having reviewed the relevant intrinsic and extrinsic evidence in the record, the

Court construes the disputed terms and phrases as provided below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Research in Motion Limited and Research in Motion Corporation

(collectively, "RIM") brought this declaratory judgment action, seeking judgment that RIM's

line of BlackBerry devices does not infringe Defendant DataQuill BVI, Ltd.'s ("DataQuill"

or the "Patentee") rights in the Patents and that the Patents are invalid. DataQuill

counterclaimed, alleging infringement of numerous claims of both Patents.

The Patents, which share essentially the same specification,[1] generally disclose a handheld data entry device that can be used for inventorying, purchasing products, and other data management functions. Two other courts have previously construed at least some of the claim terms disputed in this case. *See DataQuill Ltd. v. Kyocera Wireless Corp.*, No. 01CV2302B, slip op. at 17-18 (S.D. Cal. Oct. 25, 2005) (hereinafter, the "*Kyocera* Order"); *DataQuill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2003 U.S. Dist. LEXIS 2981, at *13-16, 24-29 (N.D. Ill. Feb. 28, 2003).

## II. CLAIM CONSTRUCTION STANDARDS

Claim construction is a question of law for the Court. *See Markman*, 517 U.S. at 391. In construing the claims of a patent, the words comprising the claims "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). Accordingly, courts must determine the meaning of claim terms in light of the resources that a person with such skill would review to understand the patented technology. *See id.* at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). First, "the person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification." *Id.* at 1313. If the specification "reveal[s] a special definition given to a claim term by the patentee

---

[1]The '591 Patent is a second continuation of the application that became the '304 Patent. The Patents' specifications are essentially identical. They differ only in that the '591 specification includes section headings – e.g., "BACKGROUND" – not found in the original application. For convenience, the Court cites only to the '591 Patent when citing to the Patents' specification.

that differs from the meaning it would otherwise possess . . . . , the inventor's lexicography governs." *Id.* at 1316. Likewise, if "the specification . . . reveal[s] an intentional disclaimer, or disavowal, of claim scope by the inventor . . . .[,] the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* at 1316.

In addition to the specification, courts must examine the patent's prosecution history – that is, the "complete record of the proceedings before the PTO and includ[ing] the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. In particular, courts must look to the prosecution history to determine "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

Finally, in addition to evidence intrinsic to the patent at issue and its prosecution history, courts may look to "extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 517 U.S. at 980). In general, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318.

### III. CONSTRUCTION OF DISPUTED TERMS

Based on the Court's review of the relevant intrinsic and extrinsic evidence in the record, the Court construes the disputed[2] terms and phrases of the Patents as follows:

#### A. Claim Terms Including "Sensor"

All claims asserted in this case call for a "sensor" element of some type. The parties dispute the meaning of four terms that involve a "sensor" or "sensing."

##### 1. "Reading Sensor" and "Sensor Operable for Sensing Commands or Data" – A "reading sensor" is a sensor capable of detecting and reporting commands or data; a "sensor operable for sensing commands or data" is a reading sensor. Although the Patentee primarily made reference to a "reading sensor" element in disclosing and claiming its invention, the Patentee also made significant use of the term "sensor" alone, without the modifier "reading." "Sensor" appears in the Patents' specification in numerous places, *see* '591 Patent at col. 2, l. 40; col. 2, l. 51; col. 4, ll. 1-2; col. 4, l. 7; col. 16, l. 51, and as part of the phrase "sensor operable for sensing commands or data" in independent claims 3, 47, and 61 of the '591 Patent.

RIM incorrectly argues that "sensor" recites no structure and therefore is used in claims 3, 47, and 61 as a means-plus-function element. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim . . . expressed as a means or step for performing a specified function without the recital of structure . . . shall be construed to cover corresponding structure,

---

[2]While briefing claim construction, the parties agreed on the definitions for several terms that were initially disputed. Therefore, the Court addresses below only those terms that remain in dispute.

material, or acts described in the specification and equivalents thereof."). While "[a] claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112 ¶ 6 applies . . . . , a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 1992). The presumption that section 112, ¶ 6 does not apply absent the words "means" is "a strong one that is not readily overcome." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed Cir. 2004). This presumption can be rebutted only by showing that "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *CCS Fitness*, 288 F.3d at 1369 (quoting *Watts v. WL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). However, to avoid means-plus-function status the term need not "denote specific structure;" it is enough that "the term is used . . . by persons of skill in the pertinent art . . . , even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d 1359-60. For example, the Federal Circuit has "rejected arguments that broad terms such as 'digital detector' . . . , 'eyeglass hanger member' . . . , 'reciprocating member' . . . , and 'sealingly connected' joints . . . trigger section 112, ¶ 6." *Id.* at 1360.

The Court concludes that "sensor" connotes at least *some* broad class of devices and therefore cannot rightly be equated with "a coined term lacking a clear meaning such as

'widget' or 'ram-a-fram.'"[3]  *Personalized Media Commc'n. L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998).  Specifically, the Court concludes that a person of ordinary skill in the art would understand "sensor" to mean a device that can sense/detect and report the presence of some stimulus.  *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1745 (2d ed. 2001) (defining "sensor" as "a mechanical device sensitive to light, temperature, radiation level, or the like, that transmits a signal to a measuring or control instrument."); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1066 (10th ed. 1993) (defining "sensor" as "a device that responds to a physical stimulus (as heat, light, sound, pressure, magnetism, or a particular motion) and transmits a resulting impulse (as for measurement or operating a control)").[4]  The Court, therefore, holds that a "sensor" is a structure capable of detecting a stimulus, such as light, temperature, radiation level, or the like, and that transmits a resulting signal.

---

[3]The Court also notes that the Patents include means-plus-function elements that use the traditional formulation, including the word "means."  *See* '591 Patent at col. 19, ll. 7-8 ("means for displaying a plurality of selectable items").  Presumably a claim drafter would very rarely, if ever, draft means-plus-function elements both with and without using the term "means."  *See Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 515, 548 (D. Del. 2001) (holding that when "the claim drafters . . . used both means-plus-function language and non-means-plus-function language in the claims . . . . a court should give effect to the intentional language used by the claim drafter").

[4]The Court finds these definitions compelling with two slight caveats.  First, the Court disagrees that a "sensor" must be a "mechanical" device.  For example, the Court considers a simple rigid antenna to be a "sensor" even though it is not comprised of multiple mechanical parts.  Second, the Court is reluctant to limit what a "sensor" senses to "physical" stimuli.  Although the definitions above explicitly encompass stimuli such as electromagnetism, radiation, and the like, the Court notes that these phenomena might not be readily recognized as "physical" by all.

Building from this construction of "sensor," a "reading sensor" is a sensor capable of detecting and reporting commands or data. The Patents state that a "reading sensor" "sens[es] commands and/or data." '591 Patent Abstract; '591 Patent at col. 2, ll. 35-36. Because the parties agree on the meanings of "commands" and "data," the Court sees little need to define the term further. Accordingly, the Court holds that the addition of the adjective "reading" narrows the genus of "sensors" to those devices capable of detecting and reporting specific types of stimuli, which correspond to commands or data.

RIM incorrectly argues that a "reading sensor" must perform some "recognition" function on its own. The Patents make clear that the controller, rather than the sensor, performs command/data recognition in the preferred embodiment. '591 Patent at col. 10, ll. 28-30 ("At this point it should be explained that the operation of reading a bar code is performed by the processor 74 in a conventional manner."); *see also Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) ("[I]t is axiomatic that a claim construction that excludes a preferred embodiment . . . 'is rarely, if ever correct and would require highly persuasive evidentiary support.'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996))). The Patents do not require that the reading sensor know when it is looking at information understandable to the device; the reading sensor need only be capable of detecting, along with whatever else it might sense or detect, commands or data and reporting those for analysis.

Finally, given the constructions above for "sensor" and "reading sensor," the Court can find no difference between the term "reading sensor" and the phrase "sensor operable for

sensing commands or data." Therefore, the Court holds that a "sensor operable for sensing commands or data" is a reading sensor.[5]

**2. *Remaining "Sensor" Terms*** – "User selectable by means of said reading sensor" means selectable by a user by use of the reading sensor. The Court can discern no material distinction between the parties' proposed constructions for this term. Accordingly, the Court adopts DataQuill's proposal because of its relative simplicity.

A "camera operable for sensing and capturing data" is a camera that can be operated to sense and capture optical data, such as images or optical information derived from images.[6] The Patents use the terms "data" and "images" in a confusing – and essentially unexplained – manner that complicates construction of this phrase. RIM quite reasonably proposes a construction limiting what a camera can capture to "images." Indeed, a "camera" is generally understood to be a device that forms "images." *See* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 317 (6th ed. 2003) (defining "camera" as "[a] light-tight enclosure containing an aperture (usually provided with an optical lens or system of lenses) through which the light from an object passes and forms an image, often on light-sensitive material, inside"); LAROUSSE DICTIONARY OF SCIENCE AND TECHNOLOGY 156

---

[5]Although the Court cannot fully explain the Patentee's decision to replace "reading sensor" with "sensor operable for sensing commands or data" in certain claims, conflation of the terms "reading sensor" and "sensor" is not unprecedented in the Patents. Specifically, the Patentee used "sensor" several times in the Patents' specification as a shorten reference for "reading sensor." *See* '591 Patent at col. 2, ll. 40, 51; col. 4, ll. 1, 7; col. 16, l. 51.

[6]The parties agree that the phrase "a sensor operable to sense and capture data wherein said sensor is a camera," which is used elsewhere in the Patents, should be construed the same as the above phrase.

(1995) (defining "camera" as an "[a]pparatus for forming an image of an external scene or subject on a light-sensitive surface, such as a photographic emulsion or the target in a TV camera tube"); MERRIAM-WEBSTER'S ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/camera (defining "camera" as "a device that consists of a lightproof chamber with an aperture fitted with a lense and a shutter through which the image of an object is projected onto a surface for recording (as on film) or for translation into electrical impulses (as for television broadcast)"). However, the Patents draw a distinction between "data" and "images," and make clear that "images" are a subset of "data." *Compare* '591 Patent at col. 19, ll. 38-39 (claiming as an element of independent claim 3 "a sensor operable to sense and capture *data* wherein said sensor is a camera" (emphasis added)) *with id.* at col. 21, ll. 40-42 (claiming as an element of dependent claim 22 "[a] portable handheld computer according to claim 3 wherein said data captured by said sensor is one or more *images*" (emphasis added)). Accordingly, the Court must presume that the Patentee did not intend to limit a camera to the collection of "images" because the Patentee chose to use the term "data" here and "images" elsewhere. *See Phillips*, 415 F.3d at 1314 ("Difference among claims can also be a useful guide in understanding the meaning of particular claim terms . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Accordingly, the Court concludes that, here, "data" means any optical data that a camera can sense from a formed image.[7] This data might be the entire image or it might be, for example, statistical information such as the average level of light intensity across an image, the presence or absence of some wavelength of light, or the like, which is useful for some functionality that does not require capturing entire images formed in the camera.[8] The Court, thus, defines "camera operable for sensing and capturing data" as a camera that can be operated to sense and capture optical data, such as images or optical information derived from images.[9]

### B.  "Commands and/or Sensed Commands and Data"

"Sensed commands and data" are instructions, which have been detected by a reading sensor, and information.[10]   RIM argues that the adjective "sensed" modifies both "commands" and "data" and also that both must be "read" by the reading sensor.  The Court concludes that "sensed" refers only to "commands" and not to "data."  When read in greater

_____

[7]The Court reaches this conclusion not because it is disclosed in the Patents' specification, but rather because it is the only distinction that the Court can conceive to differentiate between a camera that senses and captures "data" and one that senses and captures "images."  The Patents do disclose the use of a "camera"-based reading sensor to perform a character or fingerprint recognition function. *See* '591 Patent, col. 18, ll. 15-21. However, neither embodiment appears to shed much light on the construction of these two types of claimed cameras.

[8]Given this construction, the Patentee essentially uses "camera" in a broad sense, approaching "optical sensor."

[9]RIM also argues that, consistent with its definition of reading sensor, a camera must be able to "recognize [images'] contents."  As discussed above, the Court declines to include such a limitation.

[10]The parties agree that "data" is information and "commands" are instructions.

context – "commands and/or sensed commands and data" – the adjective "sensed" appears to most logically distinguish only between two kinds of commands. Moreover, the Patents disclose methods for inputting data that do not utilize the reading sensor. *See* '591 Patent at col. 5, ll. 2-4 ("user input means (e.g. switches)"); col. 4, ll. 42-44 ("input, *for example* via the reading sensor" (emphasis added)). Finally, as discussed above, the reading sensor does not have to perform a recognition function.

### C.  *"Controller" and "Process"*

A "controller" is logical circuitry, such as a microprocessor, application-specific integrated circuitry (ASIC), microcontroller, finite state machine, or the like, used to control one or more functions of the claimed device. To "process" means to produce an output, generated according to some mapping function, when presented with an input.

The Patents' Specification discloses that a "controller" can be "a conventional programmable microprocessor," '591 Patent col. 8, l. 66; col. 14, l. 64 - col. 15, l. 5, "a special purpose or specially configured unit (e.g., an ASIC)," *id.* at col. 9, ll. 1-3; col. 14, l. 64 - col. 15, l. 5, a microcontroller incorporated into an ASIC, *id.* at col. 15, ll. 44-45, or "one or more finite state machines," *id.* at col. 15, l. 47; col. 16, ll. 3-6. The parties, however, primarily dispute not what a "controller" is, but rather what it does. Specifically, RIM seeks to define "controller" by reference to specific functionality – receiving input signals from the sensor and identifying commands and data. The Court concludes that, to the extent a "controller" is limited to controlling certain specific functions, such limitations are incorporated in the claims themselves and, therefore, need not also be incorporated into the

term's definitions.[11] *See, e.g.*, '304 Patent at col. 18, ll. 22-23 (claiming as an element of claim 1 "a controller . . . to receive and process said input signals"); col. 18, ll. 25-26 ("to selectively control transmission over said communications interface"); col. 18, ll. 40-41 ("to cause downloading of information from a remote processing center").  Accordingly, the Court construes "controller" as logical circuitry, such as a microprocessor, application-specific integrated circuitry (ASIC), microcontroller, finite state machine, or the like, used to control one or more functions of the claimed device.

RIM next argues that to "process" means "to decode or translate input data or command signals into output data signals or command signals."  DataQuill proposes a much broader construction – "to subject to examination or analysis" – and argues that to "process" does not necessarily require the production of output.  The Court conclude's that DataQuill's proposed construction is overbroad.  For example, digital processors and other logical circuitry are, conceptually, nothing more than "black boxes" that take in binary input and produce a resulting binary output generated by the circuitry inside the box.  In other words, processors simply map input onto an output space according to the mapping function

---

[11]The Court does, however, hold that a "controller" must control some function of the claimed invention.  In the computing context, a "controller" is generally understood to control one or more functions of an electronic device.  *See* LAROUSSE DICTIONARY OF SCIENCE AND TECHNOLOGY 245 (1995) (defining "controller" as "a device which controls a functional element within a computer system"); *see also* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1334 (6th ed. 2003) (defining "microcontroller" as "[a] microcomputer, microprocessor, or other equipment used for precise process control in data handling, communication, and manufacturing"); MERRIAM-WEBSTER'S ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/microcontroller (defining "microcontroller" as "a microprocessor that controls some or all of the functions of an electronic device (as a home appliance) or system").

implemented by their circuitry. A processor, if one could still call it that, that produced no output certainly would not be useful for any purpose (save as a doorstop or landfill). On the other hand, the Court sees no need to define "process" by reference to specific types of input or output because surrounding claim language already includes such limitations to the extent they exist. *See id.* at col. 18, ll. 22-23 ("to receive and process *said input signals*"). Accordingly, the Court construes "process" as to produce an output, generated according to some mapping function, when presented with an input.

### D. "Coupled" and "Coupleable"

"Coupled" means connected or linked, and "coupleable" means capable of being connected or linked. RIM argues that "coupled" encompasses only electrical connections and also that, in the context of Claim 23 of the '304 Patent, "coupleable" means capable of being connected or linked for the purpose of communication. The Court concludes that the Patents do not clearly disavow all but electrical connections. In fact, the Patents disclose a number of ways in which components can be linked or connected without wires. *See, e.g.*, '591 Patent at col. 3, l. 7 ("wireless data link"); col. 3, l. 18 ("optical data link"). Further, the Court sees no need to add a "for communications" limitation to the construction of "coupleable" when the surrounding claim language already incorporates a more specific requirement: that the connection or link is "to a remote processing center for initiating processing of user orders." '304 Patent at col. 21, ll. 12-13.

### E. *Claim Terms Including "Display"*

A "display" is an electronic device that provides a visual representation, and "to display" means to show. The parties essentially agree on the construction of these terms. RIM argues that "a display" should be defined as capable of representing "data and commands." Again the Court sees no need to include such a limitation in the construction when, in two of the three instances in which the term appears, the claims themselves require that the "display" be able to "display commands and/or information." '304 Patent at col. 18, ll. 32-33; col. 19, ll. 17-18.

The parties also agree that "means for displaying a plurality of selectable items" is a means-plus-function term, but disagree on what the recited function entails. RIM proposes a detailed description of that function but fails to provide any support for that construction. The Court concludes that no further explanation is needed. The Court has construed the verb "display" above and the parties have previously agreed on ordinary meaning constructions for other phrases that include the term "selectable." Further, DataQuill does not dispute RIM's argument that the corresponding structure is "display 20," '591 Patent at col. 9, l. 13, "display screen 20," *id.* at col. 7, ll. 14-15, and functional equivalents thereof.

A "display interface" is a display device that provides a visual interface for a user. RIM argues that "display interface" should be strictly limited to what is disclosed in the preferred embodiment: a device that connects a display to a bus that connects to a processor. *See* '591 Patent at col. 9, ll. 13-15. However, this interpretation is much too narrow. Read as a whole, the Patents reveal that a "display interface" may itself display commands, data,

and other items, and can be "a touch sensitive screen," *id.* at col. 19, l. 29 or a "reconfigurable user interface," *id.* at col. 21, l. 21. Further, the Court sees no need to define a display interface as connected to a processor when the text of Claim 47 of the '591 Patent already requires that the display interface be coupled to the controller. *Id.* at col. 24, l. 61. Accordingly, the Court rejects RIM's proposal and accepts DataQuill's.

### F. "Comprises One or Two Manually Operable Switches for Scrolling. . ."

"Comprises one or two manually operable switches for scrolling said display in a first and/or second direction" means that the claimed invention may have *only* one or two manually operable switches for scrolling the display in a first and/or second direction, although it may have other switches for other functions. "Manually operable switches" are devices that can be operated by hand to make, break, or change connections in an electrical circuit. "Scrolling said display" means stepping through text or graphics displayed on a display.

The parties agree than "comprises one or two" does not limit the claimed invention to only one or two *total* switches, but disagree on what functions additional switches may have. In *Innovad, Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1333 (Fed. Cir. 2001), the Federal Circuit construed the term "comprising . . . a single, bi-state switch." The court held that, although the term did not "preclude other switches for other functions" from being incorporated into a dialer unit covered by the claim, the term "single" did "preclude the use of multiple switches to perform" the function recited for the single, bi-state switch. *Id.* Accordingly, the Court holds that the term "comprises one or two manually operable

switches" does not preclude the use of other switches for other functions, but does preclude the use of more than two switches to perform the recited function: scrolling said display in a first and/or second direction.

Further, the Court can discern no material difference between the parties' proposed constructions for "manually operable switches" and "scrolling said display." Accordingly, the Court essentially adopts DataQuill's proposals, which are consistent with those set forth in the *Kyocera* Order.

### G. "Wherein a Said Reading Sensor Is For Reading Coded Data"

The parties dispute whether this phrase refers to a reading sensor that reads *only* coded data[12] or a reading sensor that reads *at least* coded data. RIM provides no support for its proposed "only" limitation other than to cite specific examples from the specification. The Court concludes that nothing in the Patents clearly supports insertion of the word "only." *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

### H. "Bar and/or Dot Codes and/or Product Identifications"

RIM proposes a definition for this phrase consistent with its argument that the reading sensor must be able to recognize when sensed/detected data is understandable to the device. The Court has already rejected this argument above. The Court concludes that these terms retain their ordinary meaning and need no further elaboration. *See Advanced Comm. Design,*

---

[12]The parties agree that "coded data" is data having a recognizable pattern or structure.

*Inc. v. Premier Retail Net., Inc.*, 46 Fed. Appx. 964, 981 (Fed. Cir. 2002) ("[I]f a claim term

. . . is sufficiently clear such that no other definition is needed, the district court simply has

no duty to wave into existence a different definition, one that uses different words than the

words actually used in the claim language itself.").

## I. *"Carrier"*

A "carrier" is a medium that carries one or more data and/or command codes.[13]  The

parties principally dispute whether the carrier must be "separate from and external to" the

data entry device.  RIM provides little support for its contention that the carrier must be

separate and external other than to note that this is the case in the embodiments disclosed in

the patent.  Again, the Court can find nothing in the Patents that evinces a clear intent to

make the carrier separate and external.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d

898, 906 (Fed. Cir. 2004) ("[T]he claims of the patent will not be read restrictively unless the

patentee has demonstrated a clear intention to limit the claim scope using 'words or

expressions of manifest exclusion or restriction.'" (quoting *Teleflex, Inc. v. Ficosa N. Am.

Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002))); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355

F.3d 1327, 1331-32 (Fed. Cir. 2004) ("Moreover, '[a]bsent a clear disclaimer of particular

subject matter, the fact that the inventor anticipated that the invention may be used in a

particular manner does not limit the scope to that narrow context.'" (quoting *Brookhill-Wilk*

---

[13]In the *Kyocera* Order, the Southern District of California's construction of "carrier" additionally includes "characters, images, or graphical or alphanumeric data representations" on the list of things that may be carried on the "carrier."  The Court sees no need to include these in its construction because each already falls within the scope of either "data" or "commands," both of which the parties agree may appear on a carrier.

*1, L.L.C. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003))). Neither can the Court find a reason that a sensor/reading sensor would be incapable of sensing/detecting commands or data on a carrier that happens to be attached to the data entry device in some way.

### J. "To Input"

The Court holds that "to input" needs no construction. RIM argues that "to input" means to input by use of the reading sensor because, it asserts, this is the only method for inputting information disclosed in the patent. However, this assertion is incorrect.[14] The Patents disclose inputting information via switches, '591 Patent at col. 5, ll. 2-4 ("user input means (e.g. switches)"), and make clear that inputting information through the reading sensor is only one possible method of doing so, *id.* at col. 4, ll. 42-44 ("input, *for example* via the reading sensor" (emphasis added)). The Court concludes that the term needs no further construction. *See Advanced Comm. Design*, 46 Fed. Appx. at 981.

### K. "Modem"

A "modem" is a device that modulates information onto a carrier wave for transmission and demodulates signals to recover information from a modulated carrier wave. DataQuill argues that the Court should adopt the Southern District of California's construction set forth in the *Kyocera* Order: "a device that converts data from one form to

---

[14]Even if RIM's assertion was correct, the Federal Circuit has made clear that embodiments are exemplary and not limiting absent a clear disavowal of claim scope – even if only one embodiment is disclosed. *See Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

another." The Court rejects this definition as grossly overbroad. Under DataQuill's proposed construction, essentially anything with computing power would qualify as a modem – in fact, a person could become a modem simply by jotting down some string of binary data in hexadecimal shorthand.

The Court holds that RIM's proposed construction comports with the term's meaning to one having ordinary skill in the art. The term "modem" is short for "modulator-demodulator" and is almost unanimously defined by reference to those terms. *See Rowe Int'l Corp. v. Ecast, Inc.*, 500 F. Supp. 2d 891, 905 (N.D. Ill. 2007) (construing "modem" as "a connection between components that allows communication from one component to the other that includes a device that modulates and demodulates signals"); *Lectrolarm Custom Servs., Inc. v. Vicon Indus., Inc.*, No. 03-2330 MA/A, 2005 WL 2177000, at *23 (W.D. Tenn. Sept. 2, 2005) ("A modem is a device that modulates digital information onto a carrier wave and demodulates the signal to recover the digital information from the modulated carrier wave."); MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1358 (6th ed. 2003) (defining "modem" as "[a] combination modulator demodulator at each end of a telephone line to convert binary digital information to audio tone signals suitable for transmission over the line, and vice versa"); *cf.* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1237 (2d ed. 2001) (defining "modulate" as "to cause the amplitude, frequency, phase, or intensity (of a carrier wave) to vary in accordance with a sound wave or other signal . . . ."). Although DataQuill is correct that the Patents are not limited to communication via a wired telephone line, *see* '591 Patent at col. 3, l. 32 ("cellular telephone

network"); col. 3, l. 42 ("satellite telephone network"), DataQuill is incorrect that this fact somehow means that a "modem" need not modulate and demodulate carrier waves (whatever their medium of transmission).

### L. *"Motion detector"*

A "motion detector" is a sensor that can detect movement. RIM argues for a detailed construction of this term tracking the features of the embodiment disclosed in the Patents' specification. However, absent a clear disavowal, embodiments are exemplary, not limiting. *See, e.g.*, *Liebel-Flarsheim Co.*, 358 F.3d at 906. Accordingly, the Court construes "motion detector" consistent with its ordinary meaning and the *Kyocera* Order.

### M. *"Merchandising System"*

A "merchandising system" is a system for buying or selling merchandise. RIM again tries to import specific limitations from the embodiments disclosed in the Patents. The Court sees no need to define the term further than the construction adopted in the *Kyocera* Order, which in the Court's estimation is essentially the term's ordinary meaning. *See Advanced Comm. Design*, 46 Fed. Appx. at 981.

### N. *"User Identification Information" and "Personal Identification Number"*

The Court holds that these two terms do not require construction. The parties propose similar constructions for these terms that do little more than rearrange the words that comprise the terms. Accordingly, the Court holds that the terms need no construction beyond their ordinary meaning. *See id.*

ORDER – PAGE 20

### O.  Various Forms of "Comprise"

The parties largely agree on the meanings of "comprise" and its various forms.[15] First, the parties agree that the term "comprising" means either "including but not limited to" or "including at least."   Because there is no material difference between these two constructions, the Court chooses "including but not limited to," which has been embraced by the Federal Circuit.  *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").  Next, the parties disagree whether the terms "comprises" and "comprised of"[16] mean "includes but not limited to" or "made up of."  Consistent with the construction above, the Court construes "comprises" as "includes but not limited to." Finally, the parties dispute whether "comprise"[17] – as used in '591 Patent claims 50, 61, and 62 – means "are" or "form."   The Court sees little, if any, distinction between the two proposals.  Therefore, because the parties agree that "comprise" means "are" when used in '304 Patent claims 1 and 2, the Court chooses "are" so that all instances of the term "comprise" have the same construction.

---

[15]The Patents's claims include at least "comprising," "comprise," "comprises", and "comprised of."

[16]These terms generally appear in phrases of the form "wherein said [X] comprises [a specific subset of X]."

[17]This term appears in phrases of the form "where [W, X, Y, etc.] comprise [Z]."

### P. *"Verification Card"*

A "verification card" is a card used for verifying a user's identity. *See* '304 Patent col. 5, ll. 11-15 ("A data entry system or a merchandising system . . . preferably includes a verification device in the form of a verification card (e.g., a credit, payment or other validation card) or like carrier . . . for verification of a user identity."). RIM argues that a "verification card" must "carr[y] coded data recognizable to the data entry system" that can be used to verify the user's identity. The Court sees no need to include this limitation when the surrounding claim language already recites that a "verification card" carries "a user verification code or codes." *Id.* at col. 25 ll. 52-53. Further, as with the term "carrier," RIM argues that the "verification card" must be "separate from and external to" the data entry device. Again, for the same reasons given above, the Court declines to add such a limitation.[18]

### IV. CONCLUSION

Having reviewed the relevant intrinsic and extrinsic evidence in the record, the Court construes the disputed terms of the Patents as provided above.

---

[18]However, a "verification card" must be a "card." *See id.* col. 5, ll. 13-14 ("a verification card (e.g., a credit, payment or other validation card)"). The Court can simply imagine configurations where such a card is connected to the device in some manner; for example, by being tethered to or stored inside the device for safe keeping.

Signed August 14, 2008.

_David C. Godbey_
United States District Judge